**Mary Rose TURNER, individually and t/a Rosie's Place II; John F. Turner, individually and t/a Rosie's Place II, Plaintiffs–Appellees,**

v.

**Charles DAMMON, Detective Sergeant, Walter Currence, Corporal; Joseph J. Casper, Trooper; Harry Edwards, Trooper; Jan Roth, Corporal, Defendants–Appellants.**

**and**

**William Bell, Deputy Sheriff; James Goldsmith, Deputy Sheriff, Defendants.**

No. 86–3628.

United States Court of Appeals, Fourth Circuit.

Argued March 5, 1987.
Decided May 3, 1988.

James Joseph Doyle, III, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Md., on brief), for defendants-appellants.

Lee Saltzberg (Paul R. Kramer, Baltimore, Md., on brief), for plaintiffs-appellees.

Before WINTER, Chief Judge, WILKINSON, Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

WILKINSON, Circuit Judge:

Charles Dammon, Harry Edwards, Jan Roth, Walter Currence, and Joseph Casper, members of the Maryland State Police, appeal the denial of their summary judgment claim of qualified immunity from a suit brought against them under 42 U.S.C. § 1983 by Rose and John Turner, the owners of a bar known as "Rosie's Place II." We affirm the denial of qualified immunity as to Dammon and Edwards because the record raises a triable issue as to whether their conduct in performing a series of administrative searches at Rosie's violated clearly established Fourth Amendment standards of which a reasonable person would have known. The record makes clear that Roth, Currence, and Casper were far less involved in the alleged unconstitutional conduct, however, and we hold that they are entitled to summary judgment based on qualified immunity.

## I.

Rosie's Place II is a topless bar in St. Mary's County, Maryland. The record shows that between late 1982 and the filing of the Turners' action in January 1985, the defendants and other officers of the Mary-

land State Police and St. Mary's County Sheriff's Department conducted numerous searches of Rosie's Place and the Turners' residence. The Turners specified several of the officers' actions as the basis of their suit.[1] On November 5, 1982, a number of officers, including Dammon, Edwards, Casper, and Currence arrested several dancers and waitresses at Rosie's Place for violations of the Maryland "Female Sitters" statute, Md.Ann.Code art. 27, § 152 (1983). The statute forbids employment of female "sitters" to solicit drink orders from patrons of a bar or other establishment. Rose Turner's conviction under the statute was overturned on the ground that the statute violated the Maryland equal rights amendment, *Turner v. State*, 299 Md. 565, 474 A.2d 1297 (1984), and the charges against the other arrestees were dropped.

On November 19, 1982, Dammon, Edwards, Currence, and Roth, acting under a valid search warrant, entered the Turners' home in Lexington Park, Maryland. The officers seized books, records, and papers from the Turner residence as part of their investigation of the alleged Female Sitters violations.

On May 31, 1983, Dammon and Casper entered Rosie's Place to conduct a "bar check" under Md.Ann.Code art. 2B, § 190, which provides for warrantless searches of "any building, vehicle and premises in which any alcoholic beverages are authorized to be kept, transported, manufactured or sold." The plaintiffs allege that the officers searched through books and records, storage areas, and examined items in all parts of the premises.

Aside from these specific searches, plaintiffs allege that between late 1981 and early 1985, Dammon, Edwards, and other officers, either unnamed or not parties to the suit, entered Rosie's at least one hundred times to conduct bar checks under Md.Ann. Code art. 2B, § 190. These checks are alleged to have occurred during the busiest hours at the bar, and to have caused patrons to leave the bar. Plaintiffs also allege that officers of the Maryland State Police and St. Mary's County Sheriff's Department took up positions outside Rosie's Place to discourage patrons from entering. None of the defendants is specifically named in this allegation, however.

The defendants filed affidavits detailing their involvement in these events. Dammon and Edwards acknowledge that they participated in a large number of bar checks at Rosie's, and the record indicates that at least one hundred searches were conducted during the relevant period. Dammon has admitted that more checks were conducted at Rosie's than at any other bar, and that the checks never produced any citations or arrests. In support of these actions he has made only the statement, unsubstantiated by any records or statistics, that a disproportionate number of calls for police service came from Rosie's.

After the Turners filed their suit, the defendants moved for summary judgment on the basis of qualified immunity. The trial court granted summary judgment with respect to each of the individual acts alleged as the basis for the plaintiffs' claim. The court found the Female Sitters arrests supported by probable cause and made under a statute which, although later held unconstitutional, was presumably valid at the time of the arrests. The court held that the search of the Turner home was conducted pursuant to a valid warrant, and that none of the individual bar checks in themselves violated established constitutional rights. The court, however, denied the defendants' motion with respect to the totality of the officers' acts, which it characterized as a "pattern of harassment." The court held that the record raised a triable issue as to whether improper motives on the part of the defendants rendered the series of bar checks a violation of the plaintiffs' clearly established property right to "engage in any of the common occupations of life," *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701,

---

1. The Turners' suit originally included as defendants William Bell and James Goldsmith of the St. Mary's County Sheriff's Department. Because they have been dismissed from the suit, we do not address any of the allegations directed specifically at them.

2707, 33 L.Ed.2d 548 (1972). From this ruling, the defendants appeal.

## II.

Although an interlocutory order, the denial of a motion for summary judgment based on a claim of qualified immunity is an appealable "final decision" under 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). The public official's qualified immunity is an "entitlement not to stand trial or face the other burdens of litigation" in certain circumstances. *Id.* at 526, 105 S.Ct. at 2816. Unlike a defense to liability, qualified immunity is "effectively lost if a case is erroneously permitted to go to trial." *Id.* The immunity is intended to allow public officials to act "with independence and without fear of consequences" where their actions do not implicate clearly established rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982). This purpose cannot be achieved if officials face the possibility that they will have to stand trial without any opportunity for review of denials of their summary judgment claims of qualified immunity.

In reviewing the denial of a summary judgment motion based on qualified immunity, we look to the standard of immunity set forth in *Harlow*. Under *Harlow*, the summary judgment standard is one of the "objective reasonableness" of official conduct. *Id.* at 818, 102 S.Ct. at 2738. Officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." *Id.* Of course, if the plaintiff fails to allege "a violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell*,

472 U.S. at 526, 105 S.Ct. at 2816. Where the acts alleged by the plaintiff do constitute a violation of clearly established rights, a defendant is entitled to summary judgment if the record does not create a genuine issue as to whether the defendant in fact committed those acts. *Id.* Employing the standard of Fed.R.Civ.P. 56, we must determine, reading the pretrial record in the light most favorable to the plaintiffs, if an issue of triable fact exists as to whether defendants' conduct violated the plaintiffs' clearly established rights. We thus review the defendant's summary judgment motion under the "same standard as did the trial court." *White v. Pierce County*, 797 F.2d 812, 814 (9th Cir.1986).

Following *Mitchell*, the circuits have taken different views on the proper scope of review of denials of qualified immunity. The First Circuit has held that reviewing courts should look only to the allegations in the plaintiff's complaint, and determine whether those allegations describe a violation of clearly established law. *Bonitz v. Fair*, 804 F.2d 164 (1st Cir.1986).[2] Under this view, even where a well-developed pretrial record reveals undisputed facts, the reviewing court is to ignore the record and confine itself to the allegations in the complaint. *See Bonitz*, 804 F.2d at 167.

We reject this approach, because it eviscerates the purposes of qualified immunity that prompted the court in *Mitchell* to allow these appeals. The purposes of qualified immunity are well stated in *Harlow*: "[w]here an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2739 (*quoting Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.

---

**2.** This view focuses on language in *Mitchell* which states that an "appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of plaintiff's version of the facts" and that "the appealable issue is a purely legal one: whether the facts alleged by the plaintiff (or in some cases the defendant) support a claim of violation of clearly established law." 472 U.S. at 528 & n. 9, 105

S.Ct. at 2816 & n. 9. Although this part of the *Mitchell* opinion describes the precise issue presented in *Mitchell*—the defendant accepted the plaintiff's allegations, and challenged solely the characterization of the law as "well established"—we do not believe that it establishes a limitation on all reviews of denials of qualified immunity.

2d 288 (1967)). Qualified immunity thus protects government officials not only from liability, but from *trial*, in recognition of the fact that subjecting officials unnecessarily to trial leads to "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Id.* at 816, 102 S.Ct. at 2737. *Mitchell* therefore concluded that because qualified immunity is a right not to stand trial, the right cannot be vindicated by appellate review after final judgment.

▪ Vindication of the right thus requires that the court of appeals not confine itself to the complaint. Rather, we must inquire "whether, when all the facts are viewed in the light most favorable to the plaintiff, there is a genuine issue, triable to a jury," of a clearly established constitutional violation. *Wright v. South Arkansas Regional Health Center, Inc.*, 800 F.2d 199, 203 (8th Cir.1986); *see Green v. Carlson*, 826 F.2d 647, 651 (7th Cir.1987); *Myers v. Morris*, 810 F.2d 1437, 1459 (8th Cir.1987); *Kraus v. County of Pierce*, 793 F.2d 1105, 1108 (9th Cir.1986); *Kennedy v. City of Cleveland*, 797 F.2d 297, 298, 305–06 (6th Cir.1986); *White*, 797 F.2d at 814; *Jasinski v. Adams*, 781 F.2d 843, 846 (11th Cir.1986). Our review of this order must encompass the entire summary judgment record, i.e., the depositions, affidavits, and responses to interrogatories that we routinely canvass when the appeal is from a final order granting summary judgment. This approach will prove far fairer to public officials than "focusing only on plaintiffs' generalized hyperbole" despite the presence of a pretrial record. *Bonitz*, 804 F.2d at 179 (Campbell, C.J., dissenting). It may upon occasion save plaintiffs the burden of undergoing a lengthy trial only to find that the appellate court never believed the case presented a triable issue in the first place.

A motion for summary judgment is not a motion for judgment strictly on the pleadings. *Id.* It will seldom be difficult for a plaintiff to *plead* a violation of clearly es-

tablished law; to limit the scope of appellate review to plaintiff's allegations is entirely at odds with the goals of qualified immunity set forth in *Harlow* and *Mitchell.* Without immunity, government officials face skewed incentives that may drive them toward inaction: the person aggrieved by official actions may be quite willing to sue, but the losses to society as a whole that come from official inaction may be more diffuse and thus less likely to result in a lawsuit. *See generally* P. Schuck, *Suing Government: Citizen Remedies for Official Wrongs* 60–77 (1983). Qualified immunity is an attempt to redress this imbalance of incentives, and it entitles a defendant to summary judgment unless there is a genuine issue as to whether the defendant in fact committed a violation of clearly established law. *Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815.

### III.

▪ Our review of the summary judgment record leads us to conclude that there does exist a genuine question as to whether defendants Dammon and Edwards violated clearly established Fourth Amendment law. Accordingly we affirm the district court's denial of summary judgment as to these two defendants.

The Turners alleged both Fourth Amendment and due process violations. The facts on the present record establish a triable issue on the Turners' Fourth Amendment claim. The pattern of harassment alleged was a series of administrative searches purportedly conducted under Md.Ann.Code art. 2B § 190. The specific constitutional provision governing this type of activity is, of course, the Fourth Amendment, and it is to the law of search and seizure that we must turn in assessing the Turners' claim. It is the Fourth Amendment that establishes the "process" that is due to the subjects of government searches; the specific doctrines of search and seizure, not the generalized concepts of due process, provide the relevant legal standard in this context.[3]

---

3. The dissent would apply a due process analysis turning on the defendants' alleged unconstitutional motive. We believe that the facts of

this case make such an approach inappropriate. Where specific constitutional standards, here those of the Fourth Amendment, are applicable

The summary judgment record unquestionably raises a genuine issue as to whether defendants Dammon and Edwards violated clearly established law in the way that they administered the series of bar checks in this case. It is undisputed on the record that Rosie's Place was visited at least one hundred times. Officer Dammon has stated that he also conducted checks of other bars in the area, but he has produced no evidence to document any of these checks, and admits that he visited Rosie's more frequently than any other bar. The only justification offered for this disproportionate pattern of searches is the unsubstantiated statement that a large number of police calls came from Rosie's. Apart from the Female Sitters arrests, the record contains not a single police report documenting criminal complaints or activities, and no records of arrests.

The district court noted that "no evidence of any statistics or reports has been submitted by defendants showing a higher incidence of crime at Rosie's Place II than anywhere else in the county. In fact, defendant Dammon admitted that no criminal complaints had been filed and no liquor violations were found in any of the bar checks at Rosie's Place. Defendant Dammon explained why he went as far as cutting open liquor boxes in the storeroom, despite having never found any liquor violation, by saying, '... you never know when you are going to find a violation.' "

It is this utter absence of objective justification for the highly disproportionate number of searches at Rosie's Place that raises constitutional concerns. The two officers offer no basis from which any reviewing authority can gauge the reasonableness of their actions. That, of course, is the very definition of official lawlessness and the very behavior that the Fourth Amendment, by its express terms, forbids.

We recognize that the rules governing administrative searches are a peculiar species of Fourth Amendment law. Administrative search programs reflect the fact that important public interests may require searches conducted without traditional warrants or probable cause. The Supreme

---

to alleged conduct, it is those standards by which a plaintiffs' claim is properly judged. The Supreme Court has clearly endorsed this view in the context of qualified immunity:

[T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.... But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unlimited liability simply by alleging violation of extremely abstract rights.

*Anderson v. Creighton,* — U.S. —, 107 S.Ct. 3034, 3039, 97 L.Ed. 523 (1987). This case concerns the propriety of an administrative search, subject to the objective standards of the Fourth Amendment, rather than the "extremely abstract rights" asserted here under the Due Process Clause. Plaintiffs are not entitled to assert a Fifth or Fourteenth Amendment due process right to "engage in business" should their Fourth Amendment claims fail. Such a right would be akin to that in *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), and its progeny, which the Supreme Court has long since refused to recognize.

The dissent suggests that our opinion leaves the district court without necessary guidance on the issue of "subjective good faith." We have not discussed the defendants' subjective motives, however, because they simply are not relevant to the proper analysis in this case either now or at a possible later trial.

In this Fourth Amendment context, as in any other, "subjective good faith" simply will not be part of the qualified immunity inquiry. The relevant question, as stated by the Supreme Court in *Anderson,* is "the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant." *Id.* 107 S.Ct. at 3040.

The dissent correctly points out that in some cases, motive or intent will be relevant despite the presence of a qualified immunity issue. This is so because intent, such as purposeful racial discrimination or class based animus, is in those cases an aspect, not of the qualified immunity inquiry, but of the cause of action itself. *See,* for example, the cases cited by the dissenting opinion at note 8, *infra.* This is not such a case. Fourth Amendment claims rise or fall on the objective reasonableness of the searches conducted, not on the underlying intent or motivation. *See* W. LaFave, *Search and Seizure* § 1.2(g) (Supp.1986).

Court has thus recognized that the reasonableness of an administrative search must be subject to a flexible standard, "balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

It is not the lack of a warrant that gives rise to constitutional concerns here. Warrantless searches, such as those allowed by Md.Ann.Code art. 2B § 190, are permissible in the context of heavily regulated industries, of which liquor establishments such as Rosie's are a prime example. *See Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *United States v. Harper*, 617 F.2d 35, 38 (4th Cir.1980). Likewise, the absence of traditional probable cause would not invalidate the decision to conduct a particular search, for administrative searches can permissibly be conducted on the basis of a lesser justification. *See Camara, supra.*

It is Dammon and Edward's execution of the Maryland bar check program, not the program itself, that may be constitutionally objectionable. There is no question that the Fourth Amendment prohibition of unreasonable searches and seizures applies to the performance of administrative searches of commercial property. *See Donovan v. Dewey*, 452 U.S. 594, 598, 101 S.Ct. 2534, 2537, 69 L.Ed.2d 262 (1981); *Colonnade Catering*, 397 U.S. at 77, 90 S.Ct. at 777; *Gallaher v. City of Huntington*, 759 F.2d 1155 (4th Cir.1985). It is also beyond doubt that the fundamental function of this prohibition is to protect citizens from the "unbridled discretion" of government officials. *See, e.g., Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323, 98 S.Ct. 1816, 1826, 56 L.Ed. 2d 305 (1978). Clearly at issue on the record is whether Dammon and Edwards exercised unbridled discretion in conducting, for no apparent reason, a grossly disproportionate number of searches at Rosie's, thereby effecting the type of "unreasonable" intrusion that the Fourth Amendment forbids.

It is part of the settled law of administrative searches that they may "not be directed at particular individuals." S. Saltzburg, *American Criminal Procedure* 272 (2d ed. 1984). If it were otherwise, no enterprise would enjoy constitutional recourse from the constable's whim. The Supreme Court has emphasized that administrative search programs must be carried out in accordance with "specific neutral criteria." *Marshall*, 436 U.S. at 323, 98 S.Ct. at 1826. The Court in other contexts has contrasted permissible warrantless searches such as checkpoints that apply to all subjects equally with impermissible search programs that allow officers to single out targets for search without any justification. *See Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (condemning random automobile stops). The Court has emphasized the importance of curtailing the "discretion of Government officials to determine what facilities to search and what violations to search for," *Dewey*, 452 U.S. at 605, 101 S.Ct. at 2541, and that Fourth Amendment constraints on an administrative search program require "certainty and regularity" of application, *New York v. Burger*, —— U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).

Some of the above cases address the question whether a warrant is required rather than the standards to be used assuming a warrantless search is applicable. The import of the statements in these opinions is clear, however, and a prior holding in "identical circumstances" is not necessary for the law to have been clearly established. *See Mitchell*, 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12. The basic standards governing administrative searches condemn the baseless isolation of a single establishment for grossly disproportionate intrusions. Where, as here, a valid administrative search program authorizes warrantless inspection but provides no rules governing the procedure that inspectors must follow, "the Fourth Amendment and its various restrictive rules apply." *Colonnade Catering*, 397 U.S. at 77, 90 S.Ct. at 777. The cases upholding warrantless administrative searches clearly establish that these rules require certainty, regularity, and neutrality in the conduct of the

searches. *Burger*, 107 S.Ct. at 2648; *Dewey*, 452 U.S. at 605, 101 S.Ct. at 2541.

The Fourth Amendment delimits the presence of public authority on private premises, for the simple reason that uncautioned authority is open to abuse. The danger of abuse is greater for establishments such as Rosie's which, though licensed by law, may be the objects of public suspicion and obloquy. The rule governing administrative searches has been well stated by two leading commentators: administrative searches may permissibly be conducted either "upon a reasonable showing in the individual case of reasonable suspicion short of traditional probable cause, or upon a showing that the individual case arose by application of standardized procedures involving neutral criteria." W. La-Fave & J. Israel, *Criminal Procedure* § 3.9 at 188 (1985). No reasonable officer could possibly have believed that the Fourth Amendment allows over one hundred searches of one particular bar with no objective basis.

Nothing herein is intended to impair the inspection of establishments that sell alcoholic beverages. The burden on law enforcement officials in conforming their conduct to Fourth Amendment standards is not great in the area of traditionally regulated industries. Had the officers here established that the bars in the area were subject to random checks on a roughly equivalent basis, it could not be said that the checks violated "clearly established" law. The same would be true if the record established that the large and disproportionate number of searches at Rosie's was objectively supported by numerous arrests, by reports of criminal activity there, or even by logs detailing the subject of complaints by patrons, passersby, or neighboring establishments to which the officers had responded. At this point, however, the record contains only Dammon's unsubstantiated statements in support of an egregiously disproportionate number of searches.

We hold that on this record Dammon and Edwards are not entitled to qualified immunity and that an issue of triable fact as to these defendants' violation of settled Fourth Amendment principles appears to have been presented. Indeed, if no supplementary explanation of the defendants' conduct is added to the record, the district court may wish to entertain a motion for partial summary judgment as to liability on the plaintiffs' Fourth Amendment claim. It may later be determined that there is sufficient evidence to justify the actions alleged by the Turners and apparently acknowledged by Dammon and Edwards. That is not the case on the present record, however, and the trial court properly denied Dammon and Edwards' summary judgment motions.

## IV.

Roth, Currence, and Casper were far less involved in the allegedly unconstitutional searches, however, and the summary judgment record establishes their entitlement to qualified immunity.

■ It is undisputed on the record that defendant Roth participated only in the execution of the search warrant at the Turner home on November 19, 1983. The trial court found that because the search was conducted pursuant to a valid warrant, the officers were entitled to immunity from any claim arising out of this search based upon the objective reasonableness of their conduct. *See Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Because Roth is alleged to have participated only in this search, there is certainly no genuine issue as to whether he violated clearly established law.

■ Similarly, defendant Currence participated only in the search of the Turner home and the Female Sitters arrests. The Female Sitters arrests were undisputedly made on probable cause and pursuant to a statute that was presumptively valid at the time. They cannot, therefore, be the basis of a valid § 1983 claim. *See Street v. Surdyka*, 492 F.2d 368, 372–73 (4th Cir. 1974). Currence's level of participation in the events involving the Turners does not raise a genuine issue as to whether he violated clearly established law.

■ Finally, defendant Casper is alleged to have participated only in the Female Sitters arrests and in a single bar check on May 31, 1983. His affidavit acknowledges that he participated in "a number of bar checks." This record does not reveal a genuine issue as to whether Casper violated clearly established law. Our holding that an issue of violation of clearly established law exists as to Dammon and Edwards, despite the Fourth Amendment deference due searches of liquor establishments, is largely based on the egregious facts of their specific cases. Neither the allegations nor the affidavits in the record suggests that Casper was involved in comparable conduct.

The denial of summary judgment as to defendants Dammon and Edwards is affirmed. The denial of summary judgment as to defendants Roth, Currence, and Casper is reversed, and we remand to the district court for entry of judgment in their favor.

AFFIRMED IN PART; REVERSED IN PART; and REMANDED.

KAUFMAN, Senior District Judge, concurring in part and dissenting in part:

I concur in the denial of qualified immunity as to defendants Dammon and Edwards and in the grant of summary judgment, based on qualified immunity, in favor of defendant Roth. I dissent from the grant of summary judgment based on qual-

ified immunity in favor of defendants Casper and Currence. In addition, I believe that the failure of the majority to address the effect of a law enforcement officer's improper motive—that is, the effect of his intent to take action violative of a plaintiff's clearly established constitutional rights—upon the officer's right to assert the defense of qualified immunity leaves the district court without guidance from this court with respect to the central issue with which Judge Miller grappled below and the parties emphasized in this Court. That issue, for reasons discussed *infra*, may require determination by the district court on remand.

A.

I fully concur in the views expressed by Judge Wilkinson in Part II of his majority opinion. Moreover, review of the "entire summary judgment record," at 444, surely discloses, as Judge Wilkinson has written, "*no* apparent reason" for the "grossly disproportionate number of searches at Rosie's" by defendants Dammon and Edwards. At 446 (emphasis added). Accordingly, pursuant to the standards stated by Judge Wilkinson in Part II and his factual and legal analyses set forth in Part III with which, except for part of footnote 3, I also agree, plaintiffs, on remand, would seem presently to be entitled to the award of partial summary judgment rejecting the asserted qualified immunity defenses of defendants Dammon and Edwards.[1] Those

1. While the case law concerning standards for warrantless administrative searches may not have established entirely clear constitutional principles, *see generally* W. LaFave, **Search and Seizure** § 10.2(g) (2d ed. 1987), the number and type of searches conducted by Dammon and Edwards, without any "apparent reason" for the same, did violate "clearly established" rights of plaintiffs under the Fourth Amendment. If, on remand, the district court grants summary judgment on Fourth Amendment grounds in favor of plaintiffs against Dammon and Edwards, this case will be over as far as the question of liability is concerned. But if this case should go to trial on the issue of liability, the questions discussed in Parts C and D, *infra*, may well be reached.

The Fourth Amendment issue was not presented to or considered by the district court,

or raised by counsel in any presentation in this court or below. Nevertheless, I agree with the majority that the Fourth Amendment question must be addressed at the threshold of this appeal. But I also believe that plaintiffs' due process claim should not be treated in the manner adopted by the majority.

In the court below and in this court, plaintiffs contended—and the district court agreed—that any intentional attempt by any defendant to deprive plaintiffs of their right "to engage in any of the common occupations of life," *Board of Regents v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)), violated plaintiffs' rights under the due process clause of the Fourteenth Amendment. The majority disposes of that contention by stating that "[p]laintiffs are not entitled to assert a Fifth or Fourteenth Amendment

two defendants, having failed to state any "apparent reason" for their conduct, are not entitled to assert that defense at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Nor, since they have seemingly had "adequate time for discovery," are they entitled to any further opportunity to conduct further discovery or to file additional Fed.R. Civ.P. 56 materials. *Id.* 106 S.Ct. at 2553.[2]

### B.

A substantial amount of discovery was conducted before the district court denied the summary judgment motions of the five defendants. That denial, as the majority opinion of this panel makes clear, was required as to defendants Dammon and Edwards. As to those two officers, plaintiffs have clearly submitted in appropriate Fed. R.Civ.P. 56 form evidence that those two defendants intentionally attempted to deprive plaintiffs of their constitutional rights.[3] As to defendant Currence, while

he has stated that he only entered plaintiffs' residence twice, once in connection with the execution of the search warrant and once in connection with an investigation unrelated to this case, and that he entered Rosie's bar on only three occasions, nevertheless, the alleged involvement of Currence with one or both Dammon and Edwards on one occasion at the residence *and* at other times at the bar poses the factual question of whether Currence had knowledge of any unlawful purpose on the part of Dammon and Edwards, *if* such an unlawful purpose did exist, and conspired with those officers to forward such unlawful purpose. Without the chance to test at trial the truthfulness of defendant Currence's position that he had no knowledge of any intent by any defendant to deprive plaintiffs of their constitutional right not to be subjected to unreasonable searches *and* not to be deprived of their lawful right to engage in business,[4] plaintiffs have no way to pursue their quests for relief against an officer like defendant Currence who alleg-

due process right to 'engage in business' should their Fourth Amendment claims fail. Such a right would be akin to that in *Lochner v. New York,* 198 U.S. 45 [25 S.Ct. 539, 49 L.Ed. 937] (1905), and its progeny, which the Supreme Court has long since refused to recognize." At 445 n. 3. Perhaps *Roth* and its progeny do stand only for the proposition that a person cannot be deprived of his lawful right to do business without *procedural* due process and that deprivation of such an economic right does not rise to the level of a constitutional violation. *See* L. Tribe, *American Constitutional Law,* §§ 8–2, 11–1 n.4 (1978). Perhaps the specter of *Lochner* does negate the existence of a substantive due process—or equal protection—right of a person to have redress against a local law enforcement officer who intentionally seeks to prevent the individual from engaging in lawful business. Perhaps such a right does not exist unless the particular person is discriminated against as a member of a suspect class. But those questions involve difficult and murky constitutional areas which have not even been mentioned to date in this case by the district court or addressed by counsel either in the district court or in this court. The mention of *Lochner* in dissent by Justice Black in *Griswold v. Connecticut,* 381 U.S. 479, 514–15, 524, 85 S.Ct. 1678, 1698–99, 1703, 14 L.Ed.2d 510 (1965) did not deter six members of the Supreme Court from holding that a substantive constitutional right exists. *Griswold,* of course, dealt with personal rights of a very different nature than the due process rights asserted in this case.

Nevertheless, when a law enforcement officer's action is coupled with a specific intent to single out and harass a particular person with the purpose of preventing him from engaging in lawful business, one of the questions which arises is whether there is not involved "conduct that shocks the conscience." *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (Frankfurter, J.). While I am not prepared at this point to disagree flatly with the majority's view that no substantive constitutional right to do business exists, I am not prepared, on the other hand, to agree with that view as applied in this case, or to take a position with regard to it at this stage of this appeal.

**2.** During both the pretrial and trial phases, a defendant has the burden of going forward to establish facts supporting his assertion of a qualified immunity defense. In this circuit such a defendant also has the burden of proof to establish the same. *Arebaugh v. Dalton,* 730 F.2d 970, 972 (4th Cir.1984); *Logan v. Shealy,* 660 F.2d 1007, 1014 (4th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982).

**3.** That conclusion, of course, follows *a fortiori* from the views expressed *supra* in Part A, *i.e.,* that if plaintiffs so requested, partial summary judgment should be granted in their favor as to the qualified immunity defenses asserted by defendants Dammon and Edwards.

**4.** *See* note 1, *supra.*

edly intentionally played a supporting role in the asserted intentional unconstitutional conduct of defendants Dammon and Edwards. The same is true as to defendant Casper, who apparently participated in a number of bar checks with Dammon and/or Edwards. However, as to defendant Roth, his single involvement was in connection with one search of the residence. While Roth states that he only "stood by" at that time[5] and plaintiffs have stated that Roth, together with Dammon, "opened a safe,"[6] Roth's participation in the pattern of activities of Dammon and Edwards was minimal. Since plaintiffs had the opportunity through discovery substantially to link Roth to the alleged unlawful purposes and activities of other police officers—particularly Dammon and Edwards— they are not entitled further to pursue their claims against him in the face of his assertion of qualified immunity. *Celotex, supra.* Accordingly, I concur in the grant of summary judgment in favor of Roth on the basis of the latter's qualified immunity claim, and dissent from the grant of summary judgments in favor of defendants Casper and Currence.

### C.

If this case should proceed to trial in connection with liability issues raised by plaintiffs' complaint against defendants Dammon and Edwards, the threshold issue with regard to the defense of qualified immunity will be the "objective (albeit fact-specific) question" concerning the Fourth Amendment as stated by the majority. *See* at 445 n. 3 (quoting *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987)). But in the light of *Vizbaras v. Prieber,* 761 F.2d 1013 (4th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986) and *McElveen v. County of Prince William,* 725 F.2d 954 (4th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 88, 83 L.Ed.2d 35 (1984), those defendants will almost surely ask for a jury instruction entitling them to qualified immunity on the basis of their subjec-

tive good faith. However, whether or not defendants ask for such an instruction, plaintiffs' position to date in this case indicates that plaintiffs will seek an instruction to the jury that regardless of whether defendants Dammon and Edwards acted in subjective and/or objective good faith, neither defendant is entitled to qualified immunity if such defendant purposely violated the Fourth Amendment rights of plaintiffs. To date, plaintiffs have couched their position as to intentional pretextual wrongful conduct by defendants in terms of plaintiffs' constitutional right to engage in business, and apparently have not done so with regard to any possible violation of their Fourth Amendment rights because, up to this point, no Fourth Amendment claim has been presented by plaintiffs to the district court or to this court. While, on remand, the district court will not reach the issue of any purpose on the part of Dammon and/or Edwards to drive plaintiffs out of business, *see* at 445 n. 3, the district court will, if this case goes to trial on the issue of liability, need to reach the issue of any intentional attempt by Dammon and/or Edwards to violate the Fourth Amendment rights of plaintiffs. That is so because plaintiffs will seek to prevail as to the non-availability of the defense of qualified immunity to a defendant if that defendant has intentionally violated plaintiffs' Fourth Amendment rights. Accordingly, I do not see how this court can avoid stating its views with regard to the questions discussed in Part D, *infra.*

### D.

In the Supreme Court's majority opinion in *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), Justice Powell, also the author of the majority opinion in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), wrote that in earlier cases,[7] the Supreme Court had applied

the "totality of the circumstances" test [which] comprised two separate inquiries: an inquiry into the objective reasonable-

---

5. Tr. 55.

6. Tr. 72.

7. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

ness of the defendant official's conduct in light of the governing law, and an inquiry into the official's subjective state of mind. *Harlow v. Fitzgerald, supra,* rejected the inquiry into state of mind in favor of a wholly objective standard. Under *Harlow,* officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S., at 818 [102 S.Ct., at 2738]. Whether an official may prevail in his qualified immunity defense depends upon the "objective reasonableness of [his] conduct as measured by reference to clearly established law." *Ibid.* (footnote deleted). *No other "circumstances" are relevant to the issue of qualified immunity.*

*Davis v. Scherer,* 468 U.S. at 191, 104 S.Ct. at 3017 (emphasis added).

But in eliminating "the subjective prong from analysis of qualified immunity," the Supreme Court, as Judge Rubin has pointed out in *Kenyatta v. Moore,* 744 F.2d 1179 (5th Cir.1984), *cert. denied,* 471 U.S. 1066, 105 S.Ct. 2141, 85 L.Ed.2d 498 (1985),

did not thereby purge substantive constitutional doctrine of all subjective issues [and] it did not entirely eliminate subjective inquiry from any qualified immunity analysis: some rights, including those Kenyatta seeks to vindicate, might be violated by actions undertaken for an impermissible purpose but not by the same actions undertaken for permissible purposes.[27]

*Id.* at 1185.[8]

In *Halperin v. Kissinger,* 807 F.2d 180, 184 (D.C.Cir.1986), then Judge (now Justice) Scalia wrote:

The problem, however, is that whether (in the words of the *Harlow* test) "conduct does not violate clearly established ... rights," 457 U.S. at 818, 102 S.Ct. at 2738, often, if not invariably, depends upon the intent with which the conduct is performed. And it is impossible to place "[r]eliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law," *id.* (footnote omitted), when clearly established law makes the conduct legal or illegal depending upon the intent with which it is performed. That is precisely the situation here.

In *Halperin, id.* at 186, Judge Scalia differentiated between intent related to a *"defendant's knowledge of the state of the law "* (emphasis in original), a factor important in pre-*Harlow* cases and, on the other hand, "intent unrelated to knowledge of the law," but rather related to invalid purpose or motive, such as "intent to discriminate on the basis of race," or, as alleged herein by plaintiffs, intent to deprive plaintiffs of their right to conduct their business lawfully. By eliminating the "subjective" component of qualified immunity analysis, *Harlow,* on the one hand, eliminated inquiry into whether a defendant actually knew that he was violating the law and, on the other hand, required inquiry into determining whether a defendant should have known of the illegal nature of his actions. *Harlow* did not foreclose inquiry into the improper purpose with which a defendant has allegedly acted.[9] In *Harlow,* in which plaintiff alleged that he had been fired in retaliation for his lawful exercise of his First Amendment rights, the Supreme

---

**8.** Footnote 27 in *Kenyatta* reads as follows:

See, e.g., *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.[2d] 597 (1976) (purposeful racial discrimination necessary to constitute fourteenth amendment violation); *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (class based animus essential for action under § 1985(3)); *Wright v. Georgia,* 373 U.S. 284, 292, 83 S.Ct. 1240, 1245, 10 L.Ed.2d 349, 355 (1963) (police officer's intention to enforce racial discrimination violates equal protection). As Justices Brennan, Marshall and Blackmun point out

in their concurring opinion in *Harlow,* its standard "would not allow the official who *actually knows* that he was violating the law to escape liability for his actions, even if he could not 'reasonably have been expected' to know what he actually did know." 457 U.S. at 820, 102 S.Ct. at 2740, 73 L.Ed.2d at 411. (Emphasis in original.)

**9.** Circuit courts which have addressed the issue have concluded implicitly if not explicitly that allegations of unconstitutional purpose and motivation are in no way vitiated by *Harlow's* rejection of the subjective component of the

Court remanded the case for further factual determination of the purpose behind the challenged conduct. Herein, the district court's denial of summary judgment was occasioned by the need for such factual determination. More importantly, this court's remand for further proceedings below will probably put that question into issue.

The district court, in its opinion, wrote that in the absence of direct evidence of improper motivation, a defendant is entitled to summary judgment based on such defendant's claim of qualified immunity if there is "any evidence to support the stated basis for the official's decision, *i.e.*, whether there is any evidence upon which the official could have rationally decided to take the challenged action for the reason which the plaintiff claims is pretextual." [10] That standard, however, may provide insufficient protection to a plaintiff who challenges as pretextual a defendant's proclaimed purpose of governmental conduct, and who, at the outset of legal proceedings, may not be able to counter the defendant's assertion.

Prior to *Halperin v. Kissinger, supra,* Judge Edwards, in *Hobson v. Wilson,* 737 F.2d 1 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), in the course of reversing and remanding

for further proceedings, set forth the following guidance for trial courts:

> The kind of case we confront today, involving allegations of unconstitutional motive, offers to litigants a possible means to circumvent the new rule, simply by pleading that any act was performed with an intent to violate clearly established constitutional rights and thereby surmounting the threshold test set out in *Harlow.* We recognize that in some instances, plaintiffs might allege facts demonstrating that defendants have acted lawfully, append a claim that they did so with an unconstitutional motive, and as a consequence usher defendants into discovery, and perhaps trial, with no hope of success on the merits. The result would be precisely the burden *Harlow* sought to prevent.

*Id.* at 29.[11]

Pursuant to Judge Edwards' analysis of *Hobson,* a district court should require a plaintiff's allegations to be as specific as reasonably possible under the circumstances, but should not require a plaintiff, who, prior to any discovery, may be "able to paint only with a very broad and speculative brush," to negate all factual assertions by a defendant's denial of unlawful motivation. *Id.* at 30–31. Each plaintiff must be

---

prior double standard enunciated by *Wood v. Strickland. See Craft v. Wipf,* 810 F.2d 170, 171–73 (8th Cir.1987); *Wright v. South Arkansas Regional Health Center, Inc.,* 800 F.2d 199, 202–03 (8th Cir.1986); *Lojuk v. Johnson,* 770 F.2d 619, 621–22 n. 2 (7th Cir.1985), *cert. denied,* 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986); *see also Martin v. D.C. Metropolitan Police Dep't,* 812 F.2d 1425, 1428 (D.C.Cir.), *reh'g granted and op. vacated in unrelated part,* 817 F.2d 144 (D.C. Cir.1987); *Huron Valley Hospital, Inc. v. City of Pontiac,* 792 F.2d 563, 566–67 (6th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986); *Flinn v. Gordon,* 775 F.2d 1551, 1552 (11th Cir.1985), *cert. denied,* 476 U.S. 1116, 106 S.Ct. 1972, 90 L.Ed.2d 656 (1986). *Cf. Kenyatta v. Moore,* 744 F.2d 1179, 1184–86 (5th Cir.1984), *cert. denied,* 471 U.S. 1066, 105 S.Ct. 2141, 85 L.Ed.2d 498 (1985).

*Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), discussed by the majority, at 445 n. 3, does not suggest otherwise. In *Anderson,* the Supreme Court held that a police officer "is entitled to summary judgment" if "in light of the clearly established principles

governing warrantless searches, he could, as *a matter of law,* reasonably have believed that the search of the Creightons' home was lawful." 107 S.Ct. at 3040 (footnote omitted) (emphasis added). Writing for a majority of the Court, Justice Scalia wrote that the holding in *Anderson* "does not reintroduce into qualified immunity analysis the inquiry into officials' subjective intent that *Harlow* sought to minimize." *Id. Anderson* did not address in any way the issue of alleged intentional pretextual unlawful conduct. Nor did Justice Scalia in any way indicate in *Anderson* that he had changed the views which he expressed a year earlier in *Halperin.*

**10.** App. 144–45.

**11.** *See Allen v. Scribner,* 812 F.2d 426, 436 (9th Cir.1987) (when a qualified immunity defense is asserted in a disputed factual context, "[a] jury must decide the issue of motivation" (footnote omitted)); Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation,* 95 Yale L.J. 126, 147 (1985).

required to come forward and state in his complaint in support of any such allegation all that he can, or *Harlow* will not accomplish its purpose. But *Harlow* and its progeny are not intended to cut down a plaintiff at the threshold because such a plaintiff is unable, without any discovery, to rebut evidence proffered by a defendant who denies any wrongful motivation.

When a defendant claims qualified immunity, his alleged wrongful conduct should be individually examined as the district court performs what is essentially a balancing role: weighing each defendant's right to be held immune before such defendant is put through any more pretrial or trial procedures than are necessary, against the plaintiff's right to have a fair opportunity to establish the asserted improper purpose or motivation of a given defendant. In that role, the district court should keep in mind that the lack of sufficient involvement of a particular defendant may entitle that defendant to summary judgment on the basis of qualified immunity even if other defendants are held not to be entitled to prevail, at least short of trial, on their respective claims of qualified immunity.

### E.

In the light of the majority's silence as to the issues discussed in Part D, *supra*—issues raised in and decided by the district court, and argued to this court by both sides—the district court may well need to decide for itself how to analyze and apply the law of qualified immunity in connection with alleged intentional pretextual wrongful conduct by defendants Dammon and Edwards, without any guidance by the majority of this court. That, I believe, is unfortunate.