**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LESUEUR-RICHMOND SLATE
CORPORATION,

*Plaintiff-Appellant,*

v.

DAMIEN C. FEHRER; JAMES E.
SMITH; VERNON L. HARRIS; CONRAD
T. SPANGLER, III,

*Defendants-Appellees.*

No. 11-1112

Appeal from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, Senior District Judge.
(6:09-cv-00068-NKM-MFU)

Argued: December 7, 2011

Decided: January 13, 2012

Before KING, GREGORY, and DAVIS, Circuit Judges.

---

Affirmed by published opinion. Judge Gregory wrote the
opinion, in which Judge King and Judge Davis joined.

---

**COUNSEL**

**ARGUED:** David Paul Mitchel, MICHAEL J. BRICKHILL, PC, Appomattox, Virginia, for Appellant. Wesley Glenn Russell, Jr., OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellees. **ON BRIEF:** Michael J. Brickhill, MICHAEL J. BRICKHILL, PC, Appomattox, Virginia, for Appellant. Kenneth T. Cuccinelli, II, Attorney General, E. Duncan Getchell, Jr., Solicitor General of Virginia, Charles E. James, Jr., Chief Deputy Attorney General, Stephen M. Hall, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellees.

---

**OPINION**

GREGORY, Circuit Judge:

In this case, Appellant appeals the dismissal of its civil action brought against Appellees for alleged Fourth Amendment violations in conjunction with warrantless searches of Appellant's mining facility. Finding that there was no constitutional violation, we affirm.

I.

LeSueur-Richmond Slate Corporation ("LeSueur-Richmond") operated a slate quarry in Virginia. Appellees Damien Fehrer and Vernon Harris are mineral inspectors for the Virginia Department of Mines ("the Department"), James Smith is an inspector supervisor at the Department, and Conrad Spangler is the Department's director. The Department administers Virginia's Mineral Mine Safety Act ("the Act"), which in relevant part provides for the warrantless administrative inspections of surface mines to "respond to complaints of violations of" the Act. VA. CODE ANN. § 45.1-161.292:54(B). The Department's procedures manual provides additional

guidance on how these inspections are to be conducted. In particular, Procedure No. 2.12.00 provides:

> Upon arrival at the mine site, the mine inspector will inform the operator . . . of the nature of the complaint and the intention to conduct an investigation;

> When investigating a safety complaint, the mine inspector will make effort to conduct the inspection so as not to divulge or direct attention to the complainant who will remain anonymous. This may require the inspection of a variety of equipment and areas other than those indicated in the original complaint.

J.A. 11.

From December 2007 to June 2008, Fehrer conducted approximately twenty-five warrantless inspections of LeSueur-Richmond's mining operation after receiving anonymous tips that the mine was not in compliance with Virginia regulations. He was, on at least some of those occasions, accompanied by Smith and Harris. As a result of these inspections, the Department issued thirty-two violations against LeSueur-Richmond. In December 2009, LeSueur-Richmond filed this § 1983 action against appellees, contending that the Department's warrantless investigations violated both the federal and Virginia state constitutions. Appellees filed a motion to dismiss on four grounds: claim preclusion, *Younger* abstention, qualified immunity, and failure to state a claim. The district court granted the motion on the third and fourth grounds, and LeSueur-Richmond timely appealed.

## II.

A district court's dismissal of a complaint is reviewed de novo. *Smith v. Smith*, 589 F.3d 736, 738 (4th Cir. 2009). In determining whether the order was proper, the appellate court

accepts as true all of the well-pleaded allegations and views the complaint in the light most favorable to the non-moving party. *Mylan Labs, Inc. v. Maktari*, 7 F.3d 1130, 1134 (4th Cir. 1993). It then determines whether a "plausible claim for relief" has been made. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009).

When qualified immunity is asserted, the reviewing court should usually first ask whether the right was violated on the facts alleged, and then determine whether that right was "clearly established." *Smith*, 589 F.3d at 739 (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[W]e conclude that, while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory."). We therefore first consider LeSueur-Richmond's Fourth Amendment claims before addressing qualified immunity.

## III.

The Fourth Amendment, incorporated against the states by the Fourteenth Amendment, *Wolf v. Colorado*, 338 U.S. 25 (1949), protects the people against unreasonable searches and seizures. U.S. CONST. amend. IV. While a state actor normally must procure a warrant before conducting a search, inspections in heavily regulated industries are permissible so long as certain conditions are met. LeSueur-Richmond alleges that both the Virginia statute permitting such searches and the conduct of the inspectors in this case violate the Fourth Amendment. We consider both arguments in turn.

## A.

LeSueur-Richmond first argues that the Virginia statute is unconstitutional. A statute permitting government agents to conduct warrantless searches in the context of a heavily regulated industry is constitutional so long as it satisfies the three-pronged test laid out by the U.S. Supreme Court in *New York*

*v. Burger*, 482 U.S. 691 (1987). Here, only the third prong of the *Burger* test, requiring that the inspection program "provide a constitutionally adequate substitute for a warrant," *id.* at 702, is contested by LeSueur-Richmond.[1] That prong is divided into two subparts:

> [T]he regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.

*Id.* at 703 (citations omitted). LeSueur-Richmond contends that the statute accomplishes neither of these functions and claims that the Act is unconstitutional on its face. *Id.* at 15 (arguing the Virginia law "is facially unconstitutional"). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Without delving too deeply into the intricacies of facial versus as-applied challenges, we find that the Act provided adequate safeguards for LeSueur-Richmond.[2] Appellant

---

[1]The three prongs of the *Burger* test are that (i) there is a substantial government interest in the regulatory scheme; (ii) warrantless inspections are necessary to further the regulatory scheme; and (iii) the program provides an adequate substitute for a warrant. *Burger*, 482 U.S. at 702-03.

[2]Richmond could have styled its argument as an as-applied challenge, contending that it was subject to unconstitutional searches pursuant to the

argues that while the Supreme Court requires notice that the property "*will* be subject to periodic inspections," the Virginia statute only says that "the Department *may* enter such mines . . . ." VA. CODE ANN. § 45.1-161.292:54(B) (emphasis added). Because the Act does not guarantee that any inspections will take place, LeSueur-Richmond claims, *Burger*'s notice requirement is not satisfied. But this argument necessitates the conclusion that the statute would be constitutional only if inspectors were *obligated* to investigate each and every anonymous complaint they received—an outcome that is both a drain on the Department's resources and unnecessarily intrusive on mine operators like the appellant. Fairly read, the *Burger* Court meant that a statute permitting warrantless administrative searches must clearly indicate that the mine operator's property is subject to search, whether or not any government official actually conducts one. And here, a cursory reading of the Act demonstrates that such notice was given: "[M]ine inspectors and other employees of the Department may enter such mines in order to (i) respond to complaints of violations of this chapter . . . ." VA. CODE ANN. § 45.1-161.292:54(B). The statute informs the operator "that the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute." *Burger*, 482 U.S. at 711.

LeSueur-Richmond further asserts that the Act is not properly limited in time, place, and scope. With respect to time, the Virginia statute provides very few express limits. While the New York statute in *Burger* limited warrantless searches to "regular and usual business hours," this Act permits inspections at any time "to the extent deemed reasonable and prudent . . . at a variety of hours of the day and days of the week, including evening and night shifts, weekends, and holidays."

Virginia Act in this case. However, our holding that the Act provided adequate safeguards for Richmond precludes reversal under either formulation.

VA. CODE ANN. § 45.1-161.292:58B. The Fourth Circuit has not considered a statute with such broad application, but several sister circuits have upheld statutes that have similarly expansive language with respect to time. In *Ponce-Aldona*, for example, the Eleventh Circuit upheld a statute permitting warrantless inspections of commercial vehicles at any time, finding that "[t]ime restrictions are not feasible because trucks operate twenty-four hours a day." *United States v. Ponce-Aldona*, 579 F.3d 1218, 1226 (11th Cir. 2009). Similarly, the Act's open-ended timing provision is responsive to the fact that mining operations have both day and night shifts, and a time restriction might "render the entire inspection scheme unworkable and meaningless." *Id.* (citations omitted); *see also United States v. Delgado*, 545 F.3d 1195 (9th Cir. 2008) (upholding a commercial trucking inspection statute); *United States v. Gonsalves*, 435 F.3d 64, 68 (1st Cir. 2006) (upholding a statute permitting warrantless searches of offices that dispense controlled substances at "all reasonable hours"); *United States v. Castelo*, 415 F.3d 407, 411 (5th Cir. 2005) (upholding a vehicle inspection statute similar to the one in *Ponce-Aldona*).

As for place and scope—two interrelated inquiries—the Act provides sufficient restrictions. The statute permits warrantless searches of surface mines. Thus the discretion of inspectors extends only to mines that are regulated by the Mineral Mine Safety Act, which is analogous to the New York statute's application to any "vehicle dismantler." *Burger*, 482 U.S. at 694 n.1. Moreover, inspectors may not, as the police could in *Burger*, inspect any location subject to the statute; the Department must first receive a complaint before it undertakes an inspection. And finally, the statute permits warrantless inspections only for the purpose of finding violations of the Act; it does not contemplate searches conducted to find evidence of, for example, money laundering or assault.

It is true that under the Department's regulations, inspectors are instructed to make efforts "not to divulge or direct

attention to the [anonymous] complainant." J.A. 11. "This may require the inspection of a variety of equipment and areas *other than those indicated* in the original complaint." *Id.* (emphasis added). LeSueur-Richmond argues that this regulation—not part of the Act itself—means that inspections conducted under the Act are not sufficiently restricted. But the New York law at issue in *Burger* is broader in scope: The Virginia regulation permits inspection only of (i) areas relevant to an anonymous complaint received by the Department and (ii) such other areas which the inspector is "required" to inspect so as to "not divulge or direct attention" to the complainant. New York's law, on the other hand, permits "an agent of the commissioner [or] any police officer" to inspect a dealer's vehicle records "and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises." *Burger*, 482 U.S. at 695 n.1. That law, in other words, allows the warrantless search of *any* vehicle that happens to be on the premises.

Moreover, the mineral mine inspection regime, while warrantless, is not *suspicionless*. To the contrary, the statute's complaint requirement imposes an individualized suspicion requirement pursuant to which inspectors may only enter a premises where they have received a complaint of an actual health or safety violation. To the extent commentators have criticized the Supreme Court's administrative search doctrine, the principal criticism is of cases that uphold search regimes that not only lack limits on inspectors' discretion but also do not require individualized suspicion. *See, e.g.*, Eve Brensike Primus, *Disentangling Administrative Searches*, 111 COLUM. L. REV. 254, 277-90 (2011). The Virginia surface mineral mine inspection regime both limits inspectors' discretion and requires individualized suspicion, further buttressing its facial constitutionality.

Finally, there is a sound policy justification for Virginia's decision to extend the scope of the inspection to areas not relevant to the complaint. The regulations are designed to protect

the identity of anonymous tipsters, which both prevents retribution against those who report violations and encourages future whistleblowers. We therefore find that the Act satisfies the third prong of the *Burger* test.

B.

LeSueur-Richmond next contends that even if the statute is constitutional, the mine inspectors' conduct was not. Relying on this Court's decision in *Turner v. Dammon*, 848 F.2d 440 (4th Cir. 1988), LeSueur-Richmond distinguishes the question of whether the Virginia statute abides by the *Burger* test and whether the inspectors' conduct pursuant to that statute violated the Fourth Amendment. In *Turner*, this Court held that "[w]arrantless searches, *such as those allowed by* [the statute at issue] are permissible." *Id.* at 446 (emphasis added). But we nonetheless reversed the district court's dismissal, noting that it was the defendants' "*execution* of the Maryland bar check program, not the program itself, that may be constitutionally objectionable." *Id.*

Our decision in *Turner* points up a significant ambiguity in the Supreme Court's precedent regarding warrantless searches of heavily regulated industries. In an "ordinary" area of law where a statute/conduct distinction is made, the reviewing court can easily separate the two inquiries. In such a case, the court can first lay out a test to evaluate whether the statute is legally valid, and then go on to apply a different test to determine if the conduct in the particular case is valid. Here, in contrast, the two are not so easily pulled apart. The *Burger* decision laid out a test that applied the Fourth Amendment to the warrantless administrative search context, but that test inquires only into the provisions of the statute and not into the particular conduct of the officers in a given case. As a result, *Burger* appears to have implicitly collapsed the statute/conduct distinction: in the administrative search context, the Fourth Amendment only requires that the statute meet certain minimum requirements. At the same time, our decision in

*Turner* made clear that warrantless searches may be challenged on the basis of an official's conduct.

There are two ways we might resolve this tension. First, this Court can read *Turner* as an application of the cannon of constitutional avoidance. Because the statute in *Turner* imposed little to no limits on the police, this interpretation goes, this Court was faced with either declaring the entire law void or else reading additional restrictions into the statute. We chose the latter option, finding that where an administrative search program "provides no rules governing the procedure that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." *Id.* at 446 (citing *Donovan v. Dewey*, 452 U.S. 594, 599 (1981)). Thus, though that statute did not actually say that police officers were forbidden from harassing bar owners, a provision to that effect was read into the law because the Fourth Amendment prohibits such conduct.

Alternatively, we might resolve the tension by assuming that *Turner* instead intended to rely on the statute/conduct distinction. To do so, we must assume that *Burger* left open the question of whether a state official, acting pursuant to a constitutional law that permits warrantless inspections, can still violate the Fourth Amendment through her conduct. The Supreme Court has never directly addressed the issue. *See* WAYNE R. LAFAVRE, SEARCHES & SEIZURES § 10.2 (4th ed. 2011) ("If a departure from the traditional probable cause test is permissible as to a certain kind of business inspection, then what (if anything) is needed to justify a particular inspection at a particular business place at a particular time?")[3] *see also Lesser v. Espy*, 34 F.3d 1301, 1309 (7th Cir. 1994).

---

[3]A close reading of the language used in *Burger* provides little guidance. The Supreme Court did note in that case that the appeal was "primarily on the ground that [the New York law] was unconstitutional." *Burger*, 482 U.S. at 696. And later on, the Court said in a footnote that "[t]here is, furthermore, no reason to believe that *the instant inspection*

We adopt the second approach, and do so for two reasons. First, the only alternative is at odds with Supreme Court precedent. In *Burger*, the Supreme Court was presented with the question of what the Fourth Amendment requires of statutes that permit warrantless administrative searches, and it answered by laying out a three-prong test. *See supra* note 1. To hold that there are additional requirements would be to ignore *Burger*'s plain holding. Second, this interpretation best comports with the purpose of the Constitution's protection against unreasonable searches and seizures. The three-pronged *Burger* test permits warrantless searches so long as the relevant statute satisfies some rather basic standards. But as *Turner* demonstrates—a case where the police conducted over one hundred warrantless searches without any justification or explanation, and did not issue a single citation, *Turner*, 848 F.2d at 445—statutes that satisfy *Burger* can still be twisted into a tool of government harassment.

Having determined that under the Fourth Amendment a party may challenge both the constitutionality of the Act per-

was actually a 'pretext' for obtaining evidence [of criminal conduct]." *Id.* at 716 n.27 (emphasis added). These two assertions suggest that the Court is leaving open the question of whether the Fourth Amendment imposes any restrictions with respect to conduct. However, in the very next sentence of that footnote, the Court says, "It is undisputed that the inspection was made *solely pursuant* to the administrative scheme." *Id.* (emphasis added). Thus the Court appears to argue that because the inspection was made "solely pursuant" to the New York law, there could be no challenge to the police officers' conduct. This at least suggests that if an agent is acting pursuant to a statute and the statute is constitutional, the agent's conduct necessarily is constitutional as well. Further, the Court's jurisprudence on warrantless administrative searches has never inquired into conduct. *See Donovan v. Dewey*, 452 U.S. 594, 599 (1981) (addressing whether the statute at issue provided adequate safeguards); *Marshall v. Barlow's*, 436 U.S. 307, 323 (1978) (considering in what kind of circumstances warrantless searches are permissible); *Delaware v. Prouse*, 440 U.S. 648, 650 (1979) (finding that a police officer's vehicle stop was unconstitutional because he acted pursuant to no "standards, guidelines, or procedures").

mitting warrantless searches as well as the conduct of the government officials in a particular case, we must go on to consider whether the conduct of the mine inspectors in *this* case was unconstitutional. Unfortunately, neither the Supreme Court nor this Court has provided much guidance in answering this question. *Turner* did hold that if the officers had "no basis from which any reviewing authority can gauge the reasonableness of their actions," *id.* at 445, there is a violation of clearly established Fourth Amendment law. That is, we indicated that satisfaction of the "no basis" test would be *sufficient* to demonstrate a constitutional violation of *clearly established* law, but we never discussed what is *necessary* to prove a Fourth Amendment violation, whether clearly established or not. We further noted that the outcome in *Turner* would have been different "if the large and disproportionate number of searches . . . was objectively supported by[, among other things,] logs detailing the subject of complaints by patrons, passersby, or neighboring establishments to which the officers had responded." *Turner*, 848 F.2d at 447. Rather than venturing any farther into uncharted territory, we hew closely to *Turner* and hold that in this case, where the searches were objectively supported by multiple complaints to which the inspectors were responding and there was no indication that the inspections were a pretext for harassment or other improper conduct, there was no Fourth Amendment violation. We therefore affirm the district court's dismissal of LeSueur-Richmond's complaint for failure to state a claim upon which relief may be granted.

IV.

Appellants also included in their complaint a claim based on Virginia Code § 19.2-59, which prohibits any "search" by a state officer "except by virtue of and under a warrant issued by a proper officer." Contending that this imposes a warrant requirement for all searches, whether conducted pursuant to the Act or not, LeSueur-Richmond seeks damages pursuant to this state statute. However, under Virginia law a court must

"harmonize apparently conflicting statutes to give effect to both." *Boynton v. Kilgore*, 623 S.E.2d 922, 927 (Va. 2006). If § 19.2-59 were to apply to surface mine inspections, much of the Act would be rendered meaningless. We thus conclude, as did the district court, that § 19.2-59 must be interpreted not to apply to the type of searches at issue here. We accordingly affirm the district court's dismissal of this claim.

## V.

Finally, we address qualified immunity. Qualified immunity protects government officials from civil suits for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Francis v. Giacomelli*, 588 F.3d 186, 196 (4th Cir. 2009) (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Here, having found that there was no constitutional violation, we must conclude that Appellees are protected by qualified immunity.

## VI.

For the reasons given above, we affirm the district court's dismissal of LeSueur-Richmond's complaint.

*AFFIRMED*