David LOPEZ; Steven Eugene Smith; Gary Waverly Wooten; Floyd Tucker; Jerry Holloway, (Named Plaintiffs) and on behalf of all inmates confined in the Eastern Correctional Institution, a facility of the Maryland Division of Corrections, Plaintiffs–Appellees,

v.

Bishop L. ROBINSON, Secretary of Public Safety; Fred E. Jordan, Jr., Commissioner, Division of Corrections; Arnold J. Hopkins, Former Commissioner, Division of Corrections; Elmanus Herndon, Deputy Commissioner, Division of Corrections; Wayne B. Winebrenner, Former Warden; Kathleen S. Green, Assistant Warden, Defendants–Appellants,

and

William Donald Schaefer,
Governor, Defendant.

No. 89–7724.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 11, 1990.

Decided Sept. 17, 1990.

Richard M. Kastendieck, Asst. Atty. Gen., Baltimore, Md. (J. Joseph Curran, Jr.,

Atty. Gen., Ronald M. Levitan, Asst. Atty. Gen., Baltimore, Md., on brief), for defendants-appellants.

Irwin Raphael Kramer, Weinberg and Green, Baltimore, Md. (William W. Cahill, Jr., Weinberg and Green, Baltimore, Md., on brief), for plaintiffs-appellees.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

PHILLIPS, Circuit Judge:

Six Maryland prison officials [1] appeal the district court's interlocutory order denying their motion for summary judgment in which they claimed that they were entitled to qualified immunity from liability in damages for various constitutional claims asserted by a class of Maryland prisoners under 42 U.S.C. § 1983. We reverse the district court's interlocutory order [2] and remand for entry of judgment in favor the defendant prison officials on the monetary damages claims.

## I

In the summer of 1988, a number of inmates at Maryland's newly constructed Eastern Correctional Institution (ECI) filed similar pro se complaints under 42 U.S.C. § 1983, alleging unconstitutional conditions at the facility and seeking injunctive relief and damages from numerous state officials. ECI, a modern $95 million, 1500–bed prison, opened in late 1987 and was the largest non-transportation capital project ever undertaken by the state of Maryland. Though it began receiving inmates in late 1987, ECI was not fully occupied until the summer of 1988, the time during which the complaints herein were filed.

The district court consolidated the pro se cases, appointed counsel, and, soon thereafter, granted plaintiff inmates' motion for class certification. By the spring of 1989, the inmate class had filed its second amended complaint, and the defendant prison officials had filed a renewed motion to dismiss or for summary judgment, claiming inter alia, as in earlier motions, that they were entitled to qualified immunity from the § 1983 damages claims. The district court granted the defendants' motion in part and denied it in part. From among the myriad claims of unconstitutional conditions and policies asserted against an array of state officials, eight claims against six officials survived summary judgment. Four claims alleged violations of the eighth amendment's cruel and unusual punishment clause from inadequate heating, inadequate ventilation, inadequate hot water for showers, and double celling. Another eighth amendment claim sought damages for allegedly unconstitutional conditions during July 30–31, 1988, after lightning had struck power lines and caused a short-term water shortage in the prison. Another claim alleged a due process violation arising from the prison's policy of requiring an assistant warden to approve an inmate's request that he be physically transported to a state district court to press criminal charges against other inmates or members of the prison staff. The class also alleged several constitutional violations arising from the absence of soundproofing material in the attorney-client visiting room and the prison's policy of stationing a prison guard in the room to observe from a distance prisoners' meetings with their lawyers. Finally, the class challenged the constitutionality of an administrative remedy process whereby a housing unit lieutenant preliminarily screened grievance slips addressed to the warden.

The six officials who were denied summary judgment on qualified immunity grounds now appeal. After a brief review of the nature of the qualified immunity

---

1. Secretary of Public Safety and Correctional Services Bishop Robinson, Commissioner of the Division of Corrections Fred Jordan, Jr., former Commissioner Arnold Hopkins, then-Acting Commissioner Elmanus Herndon, former Warden Wayne Winebrenner, and then-Acting Warden Kathleen Green.

2. We have jurisdiction to review this order under 28 U.S.C. § 1291. See Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (denial of summary judgment on qualified immunity grounds is appealable "final decision" under § 1291).

defense, and the inquiry required when it is asserted in a summary judgment motion, we address the individual claims of constitutional violation. Although our analysis of each claim varies in some particulars, our conclusion as to each is either that a reasonable official would not have known that the alleged actions would violate clearly established law or that the summary judgment record discloses no genuine issue of material fact respecting the claimed constitutional violation. These six officials are therefore entitled to summary judgment on grounds of qualified immunity.

## II

When a defendant moves for summary judgment on the ground that he enjoys qualified immunity from a claim under 42 U.S.C. § 1983, a court must first ask the legal question whether the plaintiffs have alleged a violation of clearly established law of which a reasonable official would have known; summary judgment must be granted if they have not. *Turner v. Dammon*, 848 F.2d 440 (4th Cir.1988). If the plaintiffs have sufficiently alleged a violation, the court—trial or appellate— must review the entire summary judgment record to determine whether there exists a triable issue of fact as to whether the defendants committed the alleged acts and, if so, whether their conduct did violate a clearly established substantive right of which a reasonable official would have been aware. *Id.* at 443–44.

In deciding the legal question of whether a reasonable official would have known that the alleged actions violate "clearly established" law, a court must determine whether the actions would infringe "particularized" rights claimed by the plaintiff. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). While it is not necessary for the right asserted to have been previously recognized in the same factual context, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* The unlawfulness of the action must be apparent when as-

sessed from the perspective of an objectively reasonable official charged with knowledge of established law, *id.;* the defendant's subjective motives are irrelevant to the qualified immunity inquiry. *Id.* at 641, 107 S.Ct. at 3039. The Supreme Court has opined that these standards serve the public interest that governmental action not implicating clear rights be taken " 'with independence and without fear of consequences.' " *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982) (quoting *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967)). The qualified immunity defense from § 1983 damages claims is more than merely a defense from liability; it is an "entitlement not to stand trial or face the other burdens of litigation" that would be "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Qualified immunity is therefore structured to "reflect[ ] the concern that civil damages awards against public officials for every judicially determined violation of constitutional rights would prove too expensive to the public, discourage public service employment and impair governmental decisionmaking." *Tarantino v. Baker*, 825 F.2d 772, 774 (4th Cir.1987); *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity gives "ample protection to all but the plainly incompetent or those who knowingly violate the law.").

## III

We address first the applicability of the qualified immunity defense to the inmates' various claims that the prison officials subjected them to cruel and unusual punishment in violation of the eighth amendment. Before describing the particulars of these claims, we briefly review clearly established standards for finding eighth amendment violations in prison conditions. Each of the inmates' five claims is fatally deficient, either because no eighth amendment violation has been alleged or because the summary judgment record discloses no genuine issue of material fact under these standards.

### A

■ In *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court provided standards to guide lower courts adjudicating whether prison conditions violate the eighth amendment's prohibition of cruel and unusual punishment. Prison conditions are unconstitutional if they constitute an "unnecessary and wanton" infliction of pain and are "totally without penological justification." *Id.* at 346, 101 S.Ct. at 2399. The existence of merely "harsh" or "restrictive" prison conditions does not implicate the eighth amendment, as such conditions could be thought part of the penalty that criminals must pay, so courts must consider whether the deprivations alleged are of constitutional magnitude. *Id.* at 347, 101 S.Ct. at 2399. Applying *Rhodes*, we have held that "before pain of a constitutional magnitude can be said to exist, there must be evidence of a serious medical and emotional deterioration attributable to" the challenged condition. *Shrader v. White*, 761 F.2d 975, 979 (4th Cir.1985); *see Sweet v. South Carolina Dep't of Corrections*, 529 F.2d 854 (4th Cir.1975). Moreover, prison officials' "deliberate indifference" to conditions must cause the constitutionally cognizable harm; negligence or good faith error causing such harm will not establish a constitutional claim. *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 184, 89 L.Ed.2d 251 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.").

■ Broader considerations also inform the Supreme Court's eighth amendment jurisprudence. The Court has repeatedly affirmed the bedrock principle that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *see Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987); *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977). By the same token, the Court has persistently reminded lower courts that considerations of separation of powers and institutional competence suggest the need for judicial restraint before reaching the stern conclusion that prison administrators' conduct constitutes deliberate indifference. *See Turner*, 482 U.S. at 84–85, 107 S.Ct. at 2259 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive Branches of Government."); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353, 107 S.Ct. 2400, 2407, 96 L.Ed.2d 282 (1987) (courts should not " 'substitute [their] judgment ... on difficult and sensitive matters of institutional administration' ... for the determinations of those charged with the formidable task of running a prison.") (quoting *Block v. Rutherford*, 468 U.S. 576, 588, 104 S.Ct. 3227, 3234, 82 L.Ed.2d 438 (1984)). Furthermore, federal judicial condemnation of state prison facilities inevitably strains federal-state relations. *Johnson v. Levine*, 450 F.Supp. 648, 653 (D.Md.), *aff'd*, 588 F.2d 1378 (4th Cir.1978).

With these principles in mind we address the qualified immunity defenses to the eighth amendment claims.

### B

■ The officials first assert qualified immunity from the claim that the ventilation systems in ECI's housing units violated constitutional standards and caused the inmates cognizable harm. Specifically, the inmates alleged that the systems were "deficient, defective, or otherwise incapable of providing adequate airflow within the individual cells" because the mechanically operated window vents were "too small" to permit much airflow, thus creating a "stagnant or stifling environment in the cells, particularly during the summer months." The inmates alleged that this condition resulted in "stress, anxiety and physical harm."

While the courts have recognized the obvious fact that inadequate ventilation could under some circumstances support an eighth amendment claim, *see, e.g., Blake v. Hall,* 668 F.2d 52 (1st Cir.1981); *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), no "clearly settled" line of minimal adequacy has been drawn by any court. It may therefore be doubtful whether allegations couched in terms as conclusory as plaintiffs' here could even be thought sufficient to state a violation of clearly established right.

Even assuming, however, that the plaintiffs have *alleged* a violation of clearly established law, there is no genuine dispute of material fact as to whether ECI's ventilation violated the eighth amendment. Undisputed evidence showed that ECI's ventilation was designed to provide each cell with 100 cfm of ventilation to keep cell temperatures fluctuating in a narrow range around 75 degrees. A computerized system, checked twice daily, monitored ventilation and cell temperatures, and records generated by the system showed that during a sample month, August 1988, the cell temperatures never rose above 80 degrees. *Cf. Peterkin v. Jeffes,* 661 F.Supp. 895, 904 (E.D.Pa.1987), *aff'd on this ground, rev'd on other grounds,* 855 F.2d 1021 (3d Cir. 1988) (American Correctional Association ventilation standard of 10 cubic feet of ventilation per minute per person not constitutionally mandated). Against this uncontroverted evidence, the inmates have pointed to nothing in the summary judgment record that would suggest the kind of "obduracy and wantonness" in dictating conditions of confinement that would implicate the eighth amendment. Plaintiffs' expert's speculative affidavit testimony that the ventilation system had the "potential" to cause cell temperatures 11 to 23 degrees above outdoor temperatures falls far short of this standard. Moreover, the record discloses no harm of constitutional magnitude. The supporting affidavits supply no hard evidence of any "unnecessary and wanton infliction of pain" resulting in "serious medical and emotional deterioration." *See, e.g.,* J.A. at 183–84 ("I am suffering mental stress as a result of being confined in a cell that lacks adequate ventilation. I believe that the lack of ventilation caused my sinus problems to be worse than usual and causes me to have more headaches"). The prison officials are entitled to qualified immunity from this claim.

### C

Next, Warden Green [3] asserts qualified immunity from a claim for damages arising out of an incident during which the inmates were confined to their cells during a short-term water shortage. On July 27, 1988, lightning struck and destroyed the electrical feeder line that supplied electricity to two of the prison's three water pumps. Water rationing measures were imposed for five days while the electrical system was being repaired. By the evening of Saturday, July 30, the available water supply had almost fallen below the safe level necessary to fight a fire. The prison administrators therefore decided to discontinue the running water in individual cells for a brief period to make up the shortfall. Water was restored to some cells by the next morning, and to all by the evening. Thus, no cell was without running water for more than 24 hours.

Coincident with the water stoppage, Warden Green ordered an apparently unrelated temporary lockdown of all prisoners. This decision was taken after a group of prisoners attempted to barricade themselves inside a dining room, leaving only after a prison tactical unit was deployed to remove them. At the same time, in another part of the prison, a group of inmates had refused to leave a dayroom, also necessitating action by a tactical unit, including the use of trained dogs to clear the inmates out of the room. Under these circumstances, Warden Green ordered a lockdown for security reasons.

The inmates' eighth amendment claim based on this incident challenges the harshness of the conditions during the 12 to 24

**3.** The district court granted the motion for summary judgment on this claim as to the other officials.

hours in which they were locked down without running water in their cells. Specifically, they allege that they had to eat their meals, which were delivered to the cells, in the presence of "the stench of human excrement" because toilets would not flush. They further allege that they "were unable to wash their hands after using the toilet, were unable to brush their teeth, or otherwise attend to personal hygiene." Another allegation complains of the lack of "free and ready access to drinking water."

We do not doubt or minimize the discomfort experienced by the inmates during this brief time. Nonetheless, assuming without deciding that these allegations implicate clear rights to basic human needs, the summary judgment record simply does not show any genuine issue of material fact under eighth amendment standards. Most obviously, the plaintiffs present no evidence of deliberate indifference on the part of Warden Green. Uncontroverted evidence showed that she ordered the shift commander in each compound to deliver water and ice to every inmate. No inmate has averred that he did not receive water, though a few state that they did not get enough. In short, Warden Green committed no culpable conduct that caused the heightened unpleasantness of the prison conditions during the time in question. On the record before us, her decisions to turn off the water and impose a short-term lock down were not "totally without penological justification." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399. Warden Green is entitled to qualified immunity from this claim.

### D

■ The officials next assert qualified immunity from the claim that an alleged inadequacy of hot water for showers violated the eighth amendment. The inmates alleged that "[t]he shower facilities lack adequate hot water to enable warm showers for all" so that "those who do not shower first are forced to bathe in cold water." J.A. at 37. Plaintiffs' expert stat-

ed in an affidavit that "[w]hen all 24 showers in a regular housing unit are utilized simultaneously, at design conditions, the available hot water supply is depleted after approximately 15 minutes."

The plaintiff inmates have not cited a single case discussing constitutional standards for hot showers. Though it is tempting to address this claim on the merits, it suffices to say that there is no clearly established, sufficiently contoured, right to hot showers in prison. A reasonable prison administrator could not have known that a court would hold that the engineering of these showers might violate the Constitution.[4] The officials are entitled to qualified immunity from this claim.

### E

■ Acting Wardens Green and Winebrenner contend that the district court erred in denying them qualified immunity from the claim that the cells were too cold during the winter; the other officials were granted summary judgment on this claim. The inmates alleged that ECI's heating systems were so deficient that "[d]uring the winter months, cells remain cold and inmates are forced to wear extra clothing and to sleep in regular clothing in order to stay warm. The cold cells have a debilitating effect on the physical and emotional well-being of the inmates." The inmates presented no evidence of the actual cell temperatures, while the acting wardens presented computer printouts showing that the temperatures fluctuated within a few degrees of 75 at all relevant times, and evidence that when prison staff workers responded to complaints of cold, the cell temperature was invariably found to be near 75 degrees. The inmates also presented no affidavit evidence of any harm suffered by the alleged coldness in the cells, though five of them responded to defendants' interrogatories by stating that they had been cold during the winter.

As with other claims, plaintiffs have cited no cases that would provide guidance to a reasonable prison official endeavoring to

---

**4.** We note that the officials state in their brief that they "have recognized that increasing hot water capacity at ECI is a desirable goal, though not a constitutional requirement," Brief of Appellants at 34, and accordingly have contracted for improvements to the water heater.

understand the extent of his minimal constitutional obligation in this respect. But assuming without deciding that the plaintiffs have sufficiently alleged a violation of some clearly established right to habitable cell temperatures, the summary judgment record shows that the inmates have presented no genuine issue of fact as to whether official deliberate indifference to cell temperatures caused serious medical or psychological harm. Acting Wardens Green and Winebrenner are entitled to qualified immunity from this claim.

### F

■■■ The final claim of eighth amendment violation as to which the officials seek qualified immunity relates to the practice of double-celling inmates. It is undisputed that ECI's inmate population exceeded the prison's design capacity by 30%. The summary judgment record, however, contained substantial uncontroverted evidence that this overrun has not had a significant adverse effect on prisoner compatibility, availability of prison jobs, adequacy of meals, or other conditions. Based on this evidence, the defendants asserted qualified immunity on the ground that there was no factual issue as to whether they had violated the eighth amendment, in light of the specific holding of *Rhodes v. Chapman* that double-celling does not, without more, violate the eighth amendment. The plaintiffs' memorandum opposing defendants' motion for summary judgment presented no evidence or argument to refute defendants' assertion of qualified immunity from the double-celling claim. The district court nonetheless denied the defendants' motion with respect to this claim. The district court noted that the double-celling evidenced overcrowding that has led to, in addition to the other claimed defects at the prison, "a lack of time in which to consume meals." The court denied summary judgment because it found that the "[d]efendants would be hard pressed to deny that they were unaware [sic] of the overcrowding at the facility, or that they were under no obligation to monitor the situation...."

Assuming without deciding that the inmates have alleged that the officials violated a clearly established right against prison overcrowding, they have failed to establish the existence of a genuine issue of fact under *Rhodes'* requirement that more than the mere fact of double-celling must be shown to support such an eighth amendment violation. The officials were entitled to qualified immunity from this claim.

### IV

Two claims of the inmates alleged that prison policies violated the prisoners' right of access to the courts. The prison officials have qualified immunity from both claims.

### A

■■■ One of these claims alleged that a prison policy of screening inmate requests that they be transported to court to press criminal charges violated due process. A memorandum describing the policy provided:

> Inmates who desire access to a Somerset County Court Commissioner for the purpose of filing charges against another inmate or a staff member must submit a written request to the appropriate Assistant Warden. This request must include a description of the alleged offense in sufficient detail to justify the need.... The Assistant Warden shall review the request. If approved, the request shall be forwarded to the Transportation Unit Supervisor, who shall arrange an appointment with the Somerset County Court Commissioner and provide transportation.

J.A. at 291. Warden Green explained the reasons for this policy. Before its implementation, prisoners automatically received transportation to court merely by declaring an intent to file criminal charges. Under the new policy, a preliminary investigation of the charge was undertaken to determine whether the expense and risk of transporting an inmate to court was warranted. In the event the preliminary investigation showed the proposed charge lacked merit, the charging prisoner was to be advised of his options should he still desire to press charges.

There is no clearly established right to transportation to a court for the purpose of filing criminal charges. The inmates rely solely on the Supreme Court's holding in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), in arguing that such a right is clearly established. *Procunier* held that "[r]egulations and practices that unjustifiably obstruct ... the right of access to the courts are invalid." *Id.* at 419, 94 S.Ct. at 1814. *Procunier,* however, involved a prisoner's right of access to courts to enforce personal rights in civil litigation. That right of access is not at issue here. No citizen has an enforceable right to institute a criminal prosecution. *Linda R. v. Richard V.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973) ("In American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). It follows, of course, that a reasonable prison official could have believed it lawful to institute a penologically justified policy to avoid the threat to public safety and waste of correctional resources incident to driving prisoners to court to press facially frivolous criminal charges. The prison officials are entitled to qualified immunity from this claim.

### B

■ The inmates also alleged that "the absence of soundproofing materials in the [attorney-client visiting] room plus the presence of a uniformed officer outside the door render this arrangement insufficient to protect the inmate's right to privacy, free access to counsel, and confidentiality of attorney-client communications." J.A. at 39. Prison regulations provided that "all conversations between the inmate and attorney may be visually observed by supervising officers, but not overheard, listened to, or recorded in any manner." J.A. at 270–76. Warden Green's uncontroverted affidavit testimony established that this policy meant that the observing officer was to sit at a desk over thirty feet away from the attorney-client meeting area. The inmate class bases its damages claims against the defendant prison officials on two affidavits, one from an inmate stating

that the observing officer once sat so close that he could hear the inmate's conversation with his lawyer and another in which a paralegal offered similar affidavit testimony. Assuming that the inmates have alleged a violation of a clearly established constitutional right of access to the courts, no record evidence establishes that any of the named defendants were personally involved with these incidents of alleged constitutional deprivations. Because liability under § 1983 cannot be premised on *respondeat superior, Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Vinnedge v. Gibbs,* 550 F.2d 926 (4th Cir.1977), the prison officials are entitled to summary judgment on this claim.

### V

■ Finally, all the prison officials, except Fred Jordan who prevailed on the summary judgment motion with respect to this claim, assert qualified immunity from the inmates' claim that Warden Green's procedure for processing prisoner grievance forms violated their constitutional rights. Specifically, the inmates alleged that they were

frequently unable to obtain copies of the forms necessary to use the Administrative Remedy Procedure. Correctional officers often require inmates to tell them why they are asking for a form before the officer will provide the form to an inmate. Notwithstanding the fact that the grievance forms are clearly addressed to the Warden or Commissioner, correctional officers sometimes intercept and read the forms after they have been filled out but before they are delivered to the addressee.

J.A. at 42. Warden Green explained the challenged policy in deposition testimony. When she took over as acting warden, there was at first a substantial backlog of grievance forms. In an effort to expedite grievances as they were filed, she arranged to have grievance boxes placed in each housing unit and to permit the housing unit lieutenant to review the grievances filed in the box to handle some of the more basic grievances on the spot. In particular, she explained, the bulk of grievances

complained of matters such as lost property or an inability to get a medical appointment. Such grievances could be handled most efficiently by a housing lieutenant. If an inmate wanted a grievance to go directly to Warden Green, he was always free to send it to her through the institutional mail. Eventually, in response to one specific grievance form, Commissioner Jordan changed Warden Green's policy for expediting grievances and directed that all grievances addressed to the Warden should be delivered to her office. Warden Green stated that she intended to follow this directive.

The inmates rely on *Landman v. Royster*, 333 F.Supp. 621 (E.D.Va.1971), to defeat the officials' assertion of qualified immunity from this claim. *Landman* held that a Virginia prison's policy of preventing inmates from writing to the state legislature constituted a violation of a prisoner's right to make his concerns known to public officials. That district court case does not clearly establish a right to a particular mode of internal grievance procedure. A more recent line of Supreme Court cases has approved prison regulations that burden fundamental rights if the challenged regulation is rationally related to reasonable objectives of prison administration. *See Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A reasonable official reading these cases certainly could have thought that the kind of decentralized grievance processing Warden Green temporarily instituted would not come close to imperiling any clear constitutional rights. All the defendant officials are entitled to qualified immunity from this claim.

## VI

For the foregoing reasons, we reverse the district court's denial of the prison officials' motion for summary judgment on the damages claims against them, and we remand for entry of judgment in their favor.

REVERSED AND REMANDED