30 F.3d 130
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
MARYLAND COMMITTEE AGAINST THE GUN BAN; Francine Cornish;
Edward B. Rothstein; Kevin M. Briscoe; Lougene
Williams, Jr.; Charlotte Louise Allen,
Plaintiffs-Appellees,
v.
Stuart Oswald SIMMS; Patricia C. Jessamy, Defendants-Appellants,
and Wendell M. FRANCE, Sergeant; Vernon Gundy, Detective;
Larry Leeson, Lieutenant; Charles Dixon, Sergeant;
Salvatore Serio, Officer; Officer John Doe 1; Officer John
Doe 2; Officer John Doe 3; Officer John Doe 4; Officer
John Doe 5; Officer John Doe 6; Officer John Doe 7;
Edward V. Woods, Commissioner, Defendants.
 No. 93-2445.
 United States Court of Appeals, Fourth Circuit.
 Argued May 10, 1994.
Decided July 14, 1994.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. William M. Nickerson, District Judge. (CA-91-3142-WN)
 ARGUED: Carmen Mercedes Shepard, Assistant Attorney General, Baltimore, MD, for appellants.
 Howard J. Fezell, Frederick, MD, for appellees.
 ON BRIEF: J. Joseph Curran, Jr., Attorney General of Maryland, Lawrence P. Fletcher-Hill, Assistant Attorney General, Baltimore, MD, for appellants.
 REVERSED AND REMANDED.
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Appellants, both prosecutors in Baltimore City, issued a subpoena to obtain records of an organization participating in "Get Out the Vote" efforts geared toward the defeat of a gun control initiative. The officers who issued and served the subpoena are alleged to have violated the constitutional rights of the appellees, by conducting an unlawful search.
 
 
 2
 Suit was brought by the Maryland Committee Against the Gun Ban (the Committee) and against the police officers who served the subpoena. The prosecutors moved for summary judgment on the theory that they were immune from suit. The Magistrate Judge, in a Report and Recommendation subsequently adopted by the district court, rejected the appellants' motion on a finding that either immunity did not attach to the activities at issue, or that the prosecutors were responsible for the alleged unconstitutional behavior of the serving officers.
 
 
 3
 * The Maryland election of November 8, 1988 included a referendum question on what came to be known as "Question 3," a law enacted by the General Assembly that created an advisory committee to review and list all handguns that, because of their size and manufacture, could be classified as "Saturday Night Specials." The Committee, formed just a few months before the election, employed hundreds, if not thousands, of employees in its campaign opposing the law. In Baltimore City, the Committee's campaign was run by Vanguard Communications, a company that specialized in "Get Out the Vote" campaigns.
 
 
 4
 Shortly before the election, the press reported complaints from members of the community that individuals associated with the Committee were trying to "buy off" the black community, allegedly by offering to hire local citizens to work on the campaign.
 
 
 5
 On Monday, November 7, 1988, the day before the election, the Baltimore Evening Sun reported that the Committee had assembled "an all-black crowd of about 200" at "the La Paragon Room, in a rough, drug-infested Baltimore neighborhood near the intersection of Liberty Heights Avenue and Garrison Boulevard" where "[t]hey signed contracts they said committed them to working from 7:00 a.m., when the polls open, until 8:00 p.m., when they close...." The Committee's Assistant Director of Information, Stephen Mays, admitted that the contracts would pay citizens for work performed on election day, although he also explained that the workers would be paid for other services as well.
 
 
 6
 Stuart Simms, the State's Attorney for Baltimore City, and Patricia Jessamy, Deputy State's Attorney, began to receive phone calls about the walk-around money shortly after the Evening Sun appeared. During the course of the next few hours, Simms met with Jessamy and Haven Kodeck, chief of the Economic Crimes Unit in the State's Attorney's Office, to discuss what action, if any, his Office should take in response to the allegations. Simms was an outspoken proponent of Question 3, even appearing in a television advertisement urging Marylanders to vote in favor of the Question.
 
 
 7
 The prosecutors were of the view that the conduct described by witnesses constituted a violation of Maryland law, which prohibits any person or committee from paying money for walk-around services or any other services as a poll worker or distributor of sample ballots performed on the day of an election. Md. Ann.Code art. 33, Sec. 26-9.1. The prosecutors believed that the evidence of the citizens who signed the contracts and the admission of the Committee's agent would support a prosecution of all entities or individuals paying walk-around money.
 
 
 8
 According to Simms' deposition, in reaching a determination as to an appropriate course of action, he took into account the limited function of the Committee. He believed that once the election was over, any documents pertaining to the conduct of the election might be destroyed. The reaction of the Committee's attorney, Paul Sullivan, when asked about service of a subpoena heightened Simms' concern about preservation of evidence. Sullivan stated that he received a telephone call from Jessamy inquiring as to who should receive service of a subpoena directed to the Committee. Sullivan indicated he would accept service if it were sent to him in the District of Columbia. Because the State's Attorney's Office does not have extra-territorial jurisdiction, Jessamy asked Sullivan for the name of an individual in Maryland upon whom the subpoena could be served. Sullivan then told her that if she would contact him later, he "would try and locate the appropriate person in Maryland to accept service." When Jessamy called later, she was told that Sullivan had gone home.
 
 
 9
 By this time, no grand jury subpoena could be obtained because no grand jury was available late on the 7th of November. In his deposition, Simms testified that since Sullivan had suggested a willingness to cooperate initially, there was no need to obtain a search warrant and that he could fulfill his objective, either to obtain the contracts or to secure their subsequent production, through service of a forthwith subpoena. Accordingly, he decided to issue a subpoena for "all documents including but not limited to contracts, materials, canceled checks concerning walk-around monies, payments [or] distributions pertaining to anti-law literature scheduled for distribution on Tuesday, November 8, 1988," and made it returnable immediately.
 
 
 10
 Sergeant Wendell P. France was still in the State's Attorney's office when Simms decided that Sullivan was not going to respond to his request for the identity of someone in Maryland to whom the subpoena could be served. According to Simms, the other officer available to serve as a witness to the service of the subpoena was Detective Gundy, who was to drive Simms home that night.
 
 
 11
 Sometime between 6:30 p.m. and 7:00 p.m., Sergeant France was called into the room where Simms had been meeting with Jessamy and Kodeck. He was told to serve a subpoena upon a representative of the Committee. According to France's deposition, it was assumed that Sullivan was on his way to the Committee's headquarters. Simms specifically recalls advising France that the document to be served was a subpoena, not a search warrant. France does not recall specifically what Simms said to him, but he understood that he was to serve a subpoena on the Committee.
 
 
 12
 Detective Gundy, Simms, and Jessamy rode to the vicinity of the Committee's headquarters in Simms' car. Simms remained in his parked car, approximately a block away from the Committee's building, and Gundy went to join France to serve the subpoena. Simms claimed that he expected that service would not take long, and that he intended to review any responsive documents that might be produced that evening. Consequently, he decided to wait in the car so that he could continue home with any of the documents.
 
 
 13
 It is undisputed that neither Simms nor Jessamy was ever in the Committee's headquarters. Nor do the plaintiffs allege that either prosecutor could observe the events occurring inside the row house that served as the Committee's headquarters.
 
 
 14
 According to Simms' Declaration, France entered the building, then returned to the car and told Simms that no one would accept the subpoena. Simms instructed France to return to the building and wait for someone in authority to arrive to accept the subpoena. Later, France returned to speak to Simms again, this time to tell him that someone was on his way to accept service. Finally, France told Simms that service of the subpoena had been accomplished, but the Committee produced no documents, asserting that none existed. Simms' deposition indicates that his only information concerning the events that transpired in the Committee's headquarters was derived from France:
 
 
 15
 The situation was very confusing as expressed to me by Sergeant France--confusing to the extent that it was unclear whether or not there was anyone in authority; it was unclear whether or not Mr. Miller or someone else would accept service; and, it was unclear whether or not Mr. Miller was going to attempt to comply; and it was unclear whether or not someone was going to arrive to be the custodian, to accept service.
 
 
 16
 According to France, upon his arrival at the Committee's headquarters, he was met by an individual who informed him that he was a District Manager. That individual refused to accept service of the subpoena. A short while later, Stephen Miller, the President of Vanguard, arrived and identified himself as an authorized agent for the Committee. When presented with the subpoena, he indicated that he wanted to contact an attorney. He was allowed to do so.
 
 
 17
 According to France, following the telephone conversation, Miller stated that he would begin to prepare the documents in compliance with the subpoena. Two people gathered up several file folders and documents and started to make copies for the officers. While waiting to receive the documents, Miller was called to the telephone. He then returned to the office and told France that another attorney wished to speak with him.
 
 
 18
 According to France, Miller changed his mind following the conversation and told France that the records requested in the subpoena could not be located and that yet another representative of the Committee was en route to Baltimore City.
 
 
 19
 The appellees strongly dispute France's version of what occurred within the premises.* A deposition taken of an officer on the scene, Salvatore Serio, states that he was instructed by Detective Gundy to guard the back door of the headquarters and make sure that no one left the building. In addition, Serio testified that the same detective gave an "order" to people in the basement of the building, instructing them to come upstairs. Witnesses for the plaintiffs testified that the police were generally nasty and that the occupants of the building were restrained from leaving. Doors were slammed, and threats by Detective Gundy were allegedly made to the effect that if the plaintiffs did not cooperate they would be taken to jail. After Gundy served the subpoena on Stephen Miller, the plaintiffs allege that France and Gundy began banging on a door and threatened to knock it down, if they were not permitted to enter. The room to which they sought entry was the room where Miller was calling a lawyer. A plaintiffs' witness testified in deposition that Detective Gundy said something to the effect of "Since you haven't given us the records, we have to take them." The same witness testified that France "started going through the papers on top of [a] desk, then opened the drawer and started going through that." France also allegedly went through a brief case, and "at one point began putting papers from the desk into a shopping bag...." After the Chairman of the Committee, Fred Griisser, arrived, he conferred with Gundy and France, and subsequently the officers left the premises.
 
 
 20
 The Committee's chairman, however, has acknowledged that he understood the officers were attempting to "serve a subpoena of some sort," that he had been told by Sullivan about the prosecutor's efforts to arrange service, that his entry onto the premises and passage through it were unimpeded, that he observed no search, that as far as he was aware nothing was physically removed, and that the officers left once they were told that no documents would be produced.
 
 
 21
 Plaintiffs allege that Simms and Jessamy were the supervisors of France and Gundy. They note that they were in a car that was parked 60 to 80 feet from the front door of the premises.
 
 
 22
 The next day, representatives of the Committee were quoted in the local press attacking Simms for the "police raid" on the headquarters. Simms has claimed that, because of the allegation of wrongdoing directed at his office, he referred investigation of the matter to the State Prosecutor for further handling. The State Prosecutor subsequently filed charges against Vanguard Communications, Stephen Miller, the president of Vanguard, and two other agents of Vanguard and the Committee for the illegal payment of money for walk-around services on behalf of the Committee.
 
 
 23
 The State Prosecutor charged that, as early as September and October 1988, the same Stephen Miller who accepted service of the State's Attorney subpoena on behalf of the Committee, participated in meetings to plan the hiring of workers for the polls on election day. Workers were to be paid anywhere from $30 to $100, with funds from the Committee. The State Prosecutor ultimately obtained guilty pleas to election law violations from Stephen Miller and the two other agents of Vanguard Communications and the Committee.
 
 II
 
 24
 Ordinarily, the denial of summary judgment is not appealable, because it is not a final order. However, the denial of the defense of qualified immunity is an exception to the general rule. See Mitchell v. Forsyth, 472 U.S. 511, 525 (1985) (denial of defense of qualified immunity is an appealable final decision under 28 U.S.C. Sec. 1291). As always, we review the district court's summary judgment determination de novo. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir.1991), cert. denied, 112 S.Ct. 1172 (1992).
 
 
 25
 An official is protected by qualified immunity either if (1) the constitutional right allegedly violated was not clearly established or (2) the actions of the officials could reasonably have been thought consistent with the rights they are alleged to have violated. Harlow v. Fitzgerald, 457 U.S. 800, 815-17 (1982); Clark v. Link, 855 F.2d 156, 160 (4th Cir.1988). Officers are immune unless the law clearly proscribes the actions they took. Id. (citing Mitchell v. Forsyth, 472 U.S. 511, 530 (1985)). See also Swanson v. Powers, 937 F.2d 965 (4th Cir.), cert. denied, 112 S.Ct. 871 (1992); Pachaly v. Lynchburg, 897 F.2d 723, 726 (4th Cir.1990); Lopez v. Robinson, 914 F.2d 486, 489 (4th Cir.1990). A defendant's subjective motives are irrelevant to the qualified immunity inquiry. Id. (quoting Anderson v. Creighton, 483 U.S. at 461).
 
 
 26
 Exploring first only the question of the issuance of the subpoena, we find that Simms and Jessamy acted reasonably on the basis of their perceptions that a violation of the electoral laws had occurred. It was probable, based on witness and news accounts, that violations of Maryland's electoral laws were being committed by the Committee. The information was received only a day before the election, making it reasonable to issue a subpoena in an effort to preserve evidence that quite possibly might be destroyed once the election was concluded. The record shows that the officers selected by Simms to serve the subpoena were well-regarded veterans of the Baltimore City Police Department.
 
 
 27
 A review of the Magistrate Judge's opinion suggests that he was perhaps overly concerned with the issuance of the subpoena itself. The Magistrate Judge concluded that "forthwith subpoenas are constitutionally suspect because the potential for their abuse is great." The court termed the subpoena "arguably unconstitutional," and called the State's Attorney's conduct in issuing it "constitutionally suspect ab initio." Apparently, the Magistrate Judge concluded that even the issuance of the forthwith subpoena might violate the Fourth Amendment, and if not, it at the least encouraged the alleged Fourth Amendment violations that accompanied its service.
 
 
 28
 We have held that the issuance of a subpoena simply does not implicate the Fourth Amendment:
 
 
 29
 We ... reject [the] assertion that a finding of probable cause ... must precede issuance of a subpoena duces tecum in the context of materials presumptively protected by the First Amendment. No precedent exists for importing the full panoply of Fourth Amendment protections into the area of grand jury subpoenas and indeed to do so would transform this area of the law substantially. A subpoena does not present the same kind of potential for intrusion upon the rights of privacy that a forcible search entails, and the resulting safeguards are therefore different. See e.g., United States v. Dionisio, 410 U.S. 1 (1973) (subpoena compelling individual to appear before grand jury does not constitute a Fourth Amendment "seizure").
 
 
 30
 In re Grand Jury 87-3 Subpoena Duces Tecum, 884 F.2d 772, 778 (4th Cir.1989), rev'd on other grounds sub nom. United States v. R. Enters., Inc., 498 U.S. 292 (1991). Although the Magistrate Judge recognized that a search warrant and a subpoena are distinct, his ruling wrongly suggests that it is a distinction without much of a difference. In ultimate effect, however, a subpoena, unlike a search warrant, is no more than a request for production that is enforceable only by a court in subsequent proceedings.
 
 
 31
 The Magistrate Judge apparently was disturbed by the specific type of subpoena employed here, namely a forthwith subpoena. Although the Magistrate Judge recognized that "[a] forthwith subpoena is not unconstitutional per se," he nevertheless characterized such subpoenas as "constitutionally suspect" and "arguably unconstitutional," and concluded that the subpoena issued in this case was inherently abusive, in that it "purports to give the bearer the authority to seize the documents." We disagree.
 
 
 32
 Rather than confer authority to seize, the subpoena "commands" the custodian to whom it is directed to produce documents and states that "the information is returnable immediately to the bearer of said subpoena." The subpoena confers no authority to seize documents that are not surrendered to him by the custodians. As with all subpoenas, the forthwith subpoena is distinguished from search warrants because "the person served determines whether he will surrender the items identified in the subpoena or challenge the validity of the subpoena prior to compliance." In re Grand Jury Subpoenas, 926 F.2d 847, 854 (9th Cir.1991).
 
 
 33
 We conclude, therefore, that the simple issuance of the subpoena in the instant case cannot support a cause of action against Simms or Jessamy.
 
 
 34
 We turn now to the facts surrounding the service of the subpoena.
 
 
 35
 Although discovery in the case has been completed, there is nothing in the record at all to contradict Simms' and Jessamy's sworn statements that they had no knowledge much less command over what transpired within the Headquarters. Viewing the evidence in a light most favorable to the non-moving party, we cannot conclude that simply because Simms and Jessamy sat in a car sixty to eighty feet away from the Headquarters that they knew what, if anything, was transpiring inside. Moreover, Simms and France, who spoke twice during the attempted service, deny that their conversation included a discussion of any of the activities alleged. The appellees have cited at length the deposition testimony of Officer Serio in an attempt to show that Jessamy and Simms intended that the service of the subpoena constitute a search. However, the basis of Serio's judgment was that "usually when we meet detectives at a location, [it] means we are going to conduct a search and seizure." "I just made an assumption that it was a search and seizure." It is clear from the deposition testimony that no one told Serio that a search was going to be conducted. More important, nothing in the Serio deposition goes to the question of whether Jessamy and Simms were unaware of what transpired inside the headquarters. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." Mitchell v. Forsyth, 472 U.S. at 526 (emphasis added).
 
 
 36
 Since we conclude that Simms and Jessamy's issuance of the subpoena was entirely reasonable and that there is no evidence in the record to conclude that they behaved unreasonably or unconstitutionally with respect to the events inside the headquarters, we find that both officials are immune from suit on the federal claims brought. Further, since the federal charges must be dismissed, we find there is no basis for supplemental jurisdiction over related state claims. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).
 
 III
 
 37
 Accordingly, the judgment must be reversed and the case remanded for dismissal of all claims against Simms and Jessamy.
 
 
 38
 REVERSED AND REMANDED.
 
 
 
 *
 There is no dispute, however, concerning the prosecutors' activities. They were never on the premises